UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

GULF COAST BANK & TRUST                 )
COMPANY d/b/a LOOKOUT CAPITAL,          )
                                        )
              Plaintiff,                )
                                        )
v.                                      )        No.:   3:25-CV-45-TAV-DCP
                                        )
HHM INTL, INC. *et al.*,                )
                                        )
              Defendants.               )

## MEMORANDUM OPINION AND ORDER

This civil action is before the Court on plaintiff's Motions for Default Judgment, submitted pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, as to defendants HHM Intl, Inc. ("HHM"), Mohan Atinder Sharma ("Mohan"), Shriak Mohan Sharma ("Shriak"), and Vibhu Mohan Sharma ("Vibhu") [Docs. 34, 35, 36, 37]. For the reasons set forth below, plaintiff's motions [Docs. 34, 35, 36, 37] will be **GRANTED in part** and **DENIED in part**.

## I.  Background

The Court takes as true the factual allegations in the complaint. *Bogard v. Nat'l Credit Consultants*, No. 1:12-CV-2509, 2013 WL 2209154, at *3 (N.D. Ohio May 20, 2013).

### A.  Plaintiff's Business

Plaintiff is in the business of factoring, which involves the purchase of accounts receivable ("Accounts") from businesses [Doc. 1 ¶ 12]. The Accounts are typically represented by invoices [*Id.*]. The entity purchasing the Accounts is known as the "Factor,"

and the entity from whom the Factor purchases the Accounts is known as the "Factoring Client" [*Id.*]. Customers of the Factoring Client, who owe payment on the Accounts, are known as an "Account Debtors" [*Id.*].

Plaintiff is a Factor, and in being such, it advances funds to its Factoring Clients by purchasing the Factoring Client's Accounts [*Id.* ¶ 13]. Plaintiff also takes a security interest in the Factoring Client's assets, which can include all of its unpaid Accounts, to secure repayment [*Id.*]. When an Account has been purchased by plaintiff, the Factoring Client does not retain any legal or equitable interests in the Account; rather, these interests, including the right to receive payment from the Account Debtor, vest with plaintiff [*Id.* ¶ 15]. To assist in collecting on Accounts, plaintiff provides notice to all of the Account Debtors, informing them that the Accounts have been assigned to plaintiff for payment and that all obligations owed to the Factoring Client are to be paid to plaintiff, i.e., the Factor [*Id.* ¶ 14].

**B.      The Parties' Agreement**

On or about January 19, 2022, plaintiff's predecessor in interest[1] and defendant HHM entered into a Factoring and Security Agreement ("Factoring Agreement"), wherein defendant HHM was the Factoring Client [*Id.* ¶¶ 17–18]. This Factoring Agreement set out the terms and conditions governing plaintiff's advancement of funds to defendant HHM for the purchase of its Accounts [*Id.* ¶ 18]. As an inducement for plaintiff to enter into the

---

[1]  Hereinafter, plaintiff's predecessor in interest and plaintiff will be collectively referred to as "plaintiff" [*See* Doc. 1 ¶ 18].

2

Factoring Agreement, defendant HHM granted a security interest in certain property as collateral for the repayment of the obligations and liabilities of defendant HHM to plaintiff [*Id.* ¶ 19; *see* Doc. 1-1, pp. 2–3, 9].

In the Factoring Agreement, defendant HHM makes several representations and warranties, including:

> The Accounts are and will remain bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business; [and] . . .
>
> The Accounts are unconditionally owed, and the Purchased Accounts will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation[.]

[Doc. 1-1, p. 13; Doc. 1 ¶ 20].[2] The Factoring Agreement also contains a "Repurchase of Accounts" provision, providing that plaintiff may require that defendant HHM repurchase any unpaid and previously factored invoices from plaintiff [Doc. 1 ¶ 21; *see* Doc. 1-1, pp. 8–9]. Under such provision, plaintiff has full recourse against defendant HHM when, among other things, an account was disputed by the Account Debtor, when HHM breached a representation or warranty, or when an Account was not paid by the Account Debtor [Doc. 1 ¶ 21; Doc. 1-1, pp. 8–9].

On the same date as the Factoring Agreement's execution, and as further consideration for plaintiff entering into such agreement, defendants Mohan, Shriak, and Vibhu executed Continuing Guaranties ("Guaranties") "unconditionally and personally

---

[2] As set forth in the Factoring Agreement, "Seller" refers to defendant HHM and "Purchaser" refers to plaintiff [*See* Doc. 1-1, p. 2].

guaranteeing the prompt full performance, payment, and discharge of all of [defendant] HHM's present and future liabilities, obligation[s], and indebtedness to [p]laintiff, including . . . the Factoring Agreement" [Doc. 1 ¶ 22; *see* Doc. 1-2].  In addition to these Guaranties, defendants Mohan, Shriak, and Vibhu executed Account Validity Certifications ("Certifications") [Doc. 1 ¶ 23; *see* Doc. 1-3].  In these Certifications, defendants Mohan, Shriak, and Vibhu make several representations and warranties, including:

> All HHM's accounts which have been or will be reported, offered, or sold under the Factoring Agreement, are and will remain genuine and in all respects what they purport to be, represent bona fide obligations of HHM's customers arising out of the sale and/or delivery of merchandise by HHM or out of the rendition of services by HHM, or both; and

> Each copy of an invoice delivered to or shown to Purchaser in the course of transactions contemplated by the Factoring Agreement is and shall be a true and genuine copy of the original invoice sent to the Account Debtor and accurately reflects all terms of the transaction from which such Account arose.

[Doc. 1 ¶ 23(a)–(b); *see* Doc. 1-3, pp. 2, 5, 8].

### C.    Defendants' Failure to Comply with Factoring Agreement

Under the terms of the Factoring Agreement, defendant HHM requested that plaintiff purchase numerous invoices reflecting amounts due from various Account Debtors for services that defendant HHM represented that it had supplied to such Account Debtors during the term of the Factoring Agreement [Doc. 1 ¶ 24].  Plaintiff purchased these invoices ("Subject Accounts") as requested [*Id.*].  The Subject Accounts, however, have not been paid because they have been disputed by the relevant Account Debtors as

4

not being valid [*Id.*]. Specifically, the invoices upon which the Subject Accounts are based are for goods and services either never provided by defendant HHM or are duplicative of previously paid invoices [*Id.*]. As a result of defendants' failure to comply with the terms of the Factoring Agreement, they are in default [*Id.* ¶ 25; *see* Doc. 1-1, pp. 14–15].

Plaintiff has made demand for payment on the Subject Accounts, but defendants have failed to and refuse to remit payment [Doc. 1 ¶¶ 26–27]. The principal amount due from defendants for the Subject Accounts, as of January 31, 2025, is $5,825,739.64, plus other damages to which plaintiff is entitled under the Factoring Agreement, including attorney's fees, court costs, and litigation costs [*Id.* ¶ 29; *see* Doc. 1-1, pp. 15, 17].

### D.     The Instant Action

On January 31, 2025, plaintiff filed its complaint against defendants asserting breach of contract, unjust enrichment, fraud, and civil conspiracy [Doc. 1 ¶¶ 30–61]. Plaintiff seeks compensatory damages no less than the principal amount totaling $5,825,739.64 and all damages to which it is entitled to under the Factoring Agreement [*Id.* at 13]. On February 21, 2025, plaintiff filed summonses returned executed as to defendants Shriak, Mohan, and HHM [Docs. 11, 12, 13 (reflecting a date of service of February 16, 2025)], and on March 19, 2025, plaintiff filed a summons returned executed as to defendant Vibhu [Doc. 14 (reflecting a date of service of February 10, 2025); *see* Docs. 16, 17, 21]. On March 28, 2025, plaintiff applied to the Clerk of Court for an entry of default as to each defendant because they failed to respond or otherwise defend this

action [Docs. 22, 24, 25, 26], and the Clerk entered default on April 23, 2025 [Doc. 27].

Plaintiff now seeks default judgment against all defendants [Docs. 34, 35, 36, 37].

## II. Analysis

Federal Rule of Civil Procedure 55 "contemplates a two-step process for obtaining a default judgment against a defendant who has failed to plead or otherwise defend." *Banner Life Ins. Co. v. Columbia State Bank*, No. 3:19-CV-119, 2020 WL 3977635, at \*1 (E.D. Tenn. July 14, 2020). "First, pursuant to Rule 55(a), a plaintiff must request from the Clerk of Court an entry of default, describing the particulars of the defendant's failure to plead or otherwise defend." *Id.* If the Clerk enters default, "the plaintiff must then move the Court for entry of default judgment pursuant to Rule 55(b)." *Id.*

After the Clerk has entered default, the court must take the complaint's factual allegations as true. *Bogard*, 2013 WL 2209154, at \*3; *see also Nat'l Satellite Sports, Inc. v. Mosley Ent., Inc.*, No. 1-CV-74510, 2002 WL 1303039, at \*3 (E.D. Mich. May 21, 2002) ("For a default judgement, well-pleaded factual allegations are sufficient to establish a defendant's liability."). However, the court must determine whether the factual allegations "are sufficient to state a claim for relief as to [the] cause of action for which the plaintiff seeks default judgment." *J & J Sports Prods., Inc. v. Rodriguez*, No. 1:08-CV-1350, 2008 WL 5083149, at \*1 (N.D. Ohio Nov. 25, 2008); *accord Harrison v. Bailey*, 107 F.3d 870 (6th Cir. 1997) (unpublished table decision) ("Default judgments would not have been proper due to the failure to state a claim against these defendants."). Although the court

6

takes factual allegations regarding liability as true, the plaintiff must prove the amount of damages. *Bogard*, 2013 WL 2209154, at *3.

### A. Choice of Law

Before determining whether the factual allegations in plaintiff's complaint are sufficient to state claims for relief, the Court finds it appropriate to briefly address the applicable law. "State substantive law applies to state law claims brought in federal court." *Shelby Cnty. v. Archon Info. Sys., LLC*, No. 2:24-CV-2282, 2024 WL 7002324, at *2 (W.D. Tenn. Oct. 25, 2024) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). In a diversity case, such as this one, the court should apply the choice-of-law principles of the forum state. *Id.* (citation omitted); *see also Masco Cabinetry Middlefield, LLC v. Cefla N. Am., Inc.*, 637 F. App'x 192, 195 (6th Cir. 2015) ("Ordinarily, a federal court exercising diversity jurisdiction applies the choice-of-law rules of the forum state."). Thus, Tennessee choice-of-law rules apply.

As to plaintiff's breach of contract claims, "Tennessee follows the rule of *lex loci contractus*, which provides that 'a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent'" such as a contractual choice-of-law provision. *Sharp v. Terminix Int'l, Inc.*, No. 2:18-cv-2072, 2018 WL 3520140, at *3 (W.D. Tenn. July 20, 2018) (quoting *Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014)); *accord McClanahan v. State Farm Life Ins. Co.*, 660 F. Supp. 3d 728, 736 (W.D. Tenn. 2023).

The contract here, i.e., the Factoring Agreement, provides that such agreement "and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Chosen State" [Doc. 1-1, p. 18]. The "Chosen State" is defined as meaning Tennessee [*Id.* at 2]. The Certifications, signed by each of the individual defendants, provide similarly [Doc. 1-3, pp. 4, 7, 10 (referencing the Factoring Agreement) ("This Certification . . . shall be enforced and interpreted in accordance with the laws of the Chosen State designated in the Agreement")]. The Guaranties in this case, again signed by the individual defendants, also provide explicitly for a choice of law of Tennessee [Doc. 1-2, pp. 6, 11, 16 (emphasis omitted) ("The validity of this guaranty, its construction, interpretation and enforcement . . . shall be determined under, governed by and construed in accordance with the internal laws of the State of Tennessee[.]")]. Thus, the Court will apply Tennessee law to plaintiff's breach of contract claims.

For tort claims, "Tennessee uses the most significant relationship test set forth in the Restatement (Second) of Conflict of Laws, 'which provides that the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state, which with respect to that issue, has the most significant relationship to the occurrence and the parties under the princip[les] stated in [Restatement (Second) of Conflict of Laws] § 6.'" *Archon Info. Sys., LLC*, 2024 WL 7002324, at *2 (quoting *Blue Grass Stock Yard of Albany, LLC v. Phillips*, 688 F. Supp. 3d 626, 631 (M.D. Tenn. 2023) (cleaned up)). In the complaint, plaintiff provides that it is a banking organization with an office in

Knoxville, Tennessee [Doc. 1 ¶ 1; *see also* Doc. 1-1, p. 19 (noting a Tennessee mailing address for plaintiff); Doc. 1-4 (civil cover sheet) (noting "Knox" as the county of residence of plaintiff)]. Plaintiff also alleges that defendants intentionally "established sufficient connections" to Tennessee, that plaintiff's causes of action arise out of and are related these connections, and that defendants' actions "caused harm in Tennessee" [Doc. 1 ¶¶ 9–10]. Considering all of this, the Court will apply Tennessee law to plaintiff's tort claims.

### B. Sufficiency of the Complaint

### 1. Breach of Contract[3]

Under Tennessee law, to make a *prima facie* case for a breach of contract claim, "a plaintiff must allege: (1) the existence of an enforceable contract, (2) nonperformance amounting to breach of the contract, and (3) damages caused by the breach of the contract." *Whitworth v. City of Memphis*, 689 S.W.3d 579, 584 (Tenn. Ct. App. 2023) (internal quotation marks omitted) (quoting *Tolliver v. Tellico Vill. Prop. Owners Ass'n*, 579 S.W.3d 8, 25 (Tenn. Ct. App. 2019)).

Here, plaintiff has alleged that the Factoring Agreement, entered into by itself and defendant HHM, constitutes a "valid and binding contract" [Doc. 1 ¶ 31; *see* Doc. 1-1]. Further, plaintiff alleges that defendants Mohan, Striak, and Vibhu, via a valid and binding contract, unconditionally and personally guaranteed the Factoring Agreement [Doc. 1 ¶ 36; Doc. 1-2], and that these defendants executed Certifications relating to the Factoring

---

[3] To note, plaintiff brings separate claims of breach of contract against defendant HHM and defendants Mohan, Striak, and Vibhu [*See* Doc. 1 ¶¶ 30–39]. However, the Court will address them simultaneously here.

9

Agreement [Doc. 1-3]. Thus, the Court finds that the first element of plaintiff's *prima facie* breach of contract claims has been met.

Next, plaintiff has alleged that defendant HHM breached the Factoring Agreement by submitting Accounts for purchase that were not based on bona fide sales and subsequently failing to and refusing to pay Accounts that were not paid by Account Debtors [Doc. 1 ¶ 33]. As to defendants Mohran, Shriak, and Vibhu, plaintiff alleges that these defendants breached the Guaranties by failing to ensure that defendant HHM complied with the Factoring Agreement, i.e, submitting bona fide and valid Accounts for purchase and reimbursing plaintiff for amounts due on the Accounts upon breach of the Factoring Agreement [*Id.* ¶ 38]. Ultimately, plaintiff asserts that defendants are in default for failing to comply with the terms of the Factoring Agreement, and while plaintiff has made demand for payment, defendants have failed to and refused to remit payment [*Id.* ¶¶ 25–27]. Considering these allegations, the Court finds that plaintiff has make a *prima facie* showing of the second element of its breach of contract claims.

Finally, plaintiff has alleged damages caused by the breach of contract, specifically, a principal amount of $5,825,739.64 stemming from plaintiff's purchase of the Subject Accounts that have not been paid [*Id.* ¶¶ 24–27, 34, 39]. Finding that plaintiff has made a *prima facie* showing of the third element of its breach of contract claims, the Court finds that plaintiff has sufficiently alleged a claim for breach of contract as to all defendants.

10

### 2. Unjust Enrichment

"Unjust enrichment is 'a quasi-contractual theory under which a court may impose a contractual obligation on the parties where one does not otherwise exist.'" *AMISUB (SFH), Inc. v. Cigna Health & Life Ins. Co.*, 681 F. Supp. 3d 842, 851 (quoting *Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1997)). To establish an unjust enrichment claim under Tennessee law, a plaintiff must show that "(1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; and (3) acceptance of such benefit under such circumstances that it would be inequitable for him or her to retain the benefit without payment of the value thereof." *United States v. Goforth*, 465 F.3d 730, 733–34 (6th Cir. 2006) (citing *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005)).

Although the Court finds that plaintiff sufficiently alleged a claim for breach of contract for purposes of default judgment, in the absence of any such enforceable contract, the Court finds that plaintiff has sufficiently alleged an alternative claim for unjust enrichment. *See generally First Fid. Cap. Mkts., Inc. v. Reliant Bank*, No. 3:17-CV-1080, 2020 WL 514577, at *4 (M.D. Tenn. Jan. 31, 2020) (citations omitted) ("[T]he existence of an express contract precludes equitable claims such as . . . unjust enrichment."). First, plaintiff has alleged that defendants received a benefit from it. Specifically, plaintiff alleges that it purchased from defendant HHM numerous invoices reflecting amounts due from various Account Debtors for services that defendant HHM represented that it had supplied [Doc. 1 ¶¶ 24, 41]. In other words, plaintiff advanced funds to defendants by

purchasing invoices from them [*See id.* ¶¶ 13, 41; *see* Doc. 1-2, pp. 2, 7, 12 (noting that the Guaranties are being entered into "in consideration of financial accommodations afforded or to be afforded to" defendant HHM); *see* Doc. 1-3, pp. 2, 5, 8 (noting that the Certifications are being entered into "in consideration of various commercial transactions being affected for the benefit of" defendant HHM)]. Defendants received advanced funds, appreciating and accepting such benefit, and plaintiff and defendants understood that plaintiff expected to be compensated via the payments of the Account Debtors on the invoices purchased [*Id.* ¶¶ 18, 42–43].

Accordingly, the Court finds that plaintiff has sufficiently alleged a claim of unjust enrichment against all defendants.

### 3. Fraud

Next, the Court turns to plaintiff's fraud claim, which appears to be more specifically, a fraudulent inducement claim [*See* Doc. 1 ¶¶ 44–53]. "To succeed on a claim of fraudulent inducement, the plaintiff must prove that the defendant '(1) made a false statement concerning a fact material to the transaction, (2) with knowledge of the statement's falsity or utter disregard for its truth[,] (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied upon, and (5) an injury resulted from this reliance.'" *BlueCross BlueShield of Tenn. v. Dunwoody Labs, Inc.*, No. 1:20-CV-167, 2021 WL 6275265, at *4 (E.D. Tenn. Dec. 8, 2021) (quoting *Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011)).

Additionally, given the Court is assessing the sufficiency of the complaint at this stage, the Court must consider the mandate of Federal Rule of Civil Procedure 9(b) for this claim, which provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The Sixth Circuit has held that, to comply with Rule 9(b), a plaintiff must allege, at minimum, the time, place, and content of the alleged misrepresentation, the fraudulent scheme, the fraudulent intent, and the injury resulting from the fraud. *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citing *U.S. ex rel. Bledsoe v. Cmty. Health Sys. Inc.*, 501 F.3d 493, 504 (6th Cir. 2007)). And, generally, "Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud." *Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024) (quoting *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006)).

Here, plaintiff alleges that, on or about January 19, 2022, defendant HHM, through the individual defendants, executed the Factoring Agreement in which they made express warranties, including that the Subject Accounts "are and will remain bona fide exi[s]ting obligations created by the sale and delivery of goods and the rendition of services" [Doc. 1 ¶ 45]. Plaintiff further alleges that, on the same date, the individual defendants executed the Certifications, expressly warranting, amongst other things, that the Accounts, including the Subject Accounts, "were or would remain genuine . . . and represented bona fide obligations of [defendant] HHM's customers arising out of the sale and/or delivery of merchandise of [defendant] HHM or out of the rendition of services by [defendant] HHM,

13

or both" [*Id.* ¶ 46]. Plaintiff asserts that the above representations were false as the Subject Accounts did not represent good and services actually provided [*Id.* ¶ 47]. Rather, the Subject Accounts represented duplicates of Accounts previously paid or invoices for services never provided [*Id.*].

Plaintiff asserts that when the individual defendants made these false statements, individually and on behalf of defendant HHM, they knew them to be false or made such statements recklessly, without regard for their truth or falsity [*Id.* ¶ 48]. Furthermore, plaintiff claims that defendants made these material representations with the intent to defraud plaintiff by inducing it to enter into the Factoring Agreement, purchase the Subject Accounts, and "make the necessary disbursements to [defendant] HHM as required by the Factoring Agreement" [*Id.* ¶¶ 49–50]. And plaintiff reasonably relied on these representations without knowing that such representations were false [*Id.* ¶ 51]. Finally, plaintiff alleges that, as a result of its reliance, it suffered damages in an amount no less than $5,825,739.64, i.e., the principal amount due from defendants on the Subject Accounts [*Id.* ¶ 52].

Considering these specific allegations and the entirety of the complaint, plaintiff has specified the "'who, what, when, where, and how' of the alleged fraud" and provided sufficient factual matter to state a claim for relief. *Greer*, 114 F.4th at 614 (citation omitted); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Thus,

14

accepting plaintiff's allegations as true, the Court finds that plaintiff has sufficiently pleaded a claim for fraudulent inducement with particularity.[4]

### 4. Civil Conspiracy

Finally, the Court turns to plaintiff's claim of civil conspiracy against all defendants [Doc. 1 ¶¶ 54–61]. In Tennessee, "[a]n actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damages to the plaintiff[.]" *Lane v. Becker*, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (citations and internal quotation marks omitted); *accord Williams v. Magnolia Bank, Inc.*, No. 3:25-CV-564, 2026 WL 1918051, at *13 (M.D. Tenn. May 22, 2026) (citation omitted) (noting that, to prevail on a civil conspiracy claim, a plaintiff must establish an overt act committed in furtherance of the conspiracy). A civil conspiracy claim "requires an underlying predicate tort allegedly committed pursuant to the conspiracy."

---

[4] While plaintiff has sufficiently alleged a claim for fraudulent inducement here, Tennessee courts have noted that a plaintiff asserting both fraudulent inducement and breach of contract can only receive remedy for one of these causes of action. *See Davis v. Conner*, No. M2008-00661-COA-R3-CV, 2009 WL 3415284, at *8 (Tenn. Ct. App. Oct. 22, 2009) ("[A] party who has been fraudulently induced into entering a contract has the option of treating the contract as void and rescinding it or going forward with the contract under the same terms as they were represented by the defrauding party[.]"); *GENash, LLC v. Rose Legacy, LLC*, No. M2024-00186-COA-R3-CV, 2025 WL 1913227, at *9 (Tenn. Ct. App. July 11, 2025) (internal quotation marks omitted) ("[T]he person induced to enter a contract by fraud may treat the contract as voidable and sue for the equitable remedy of recission or he may treat the contract as existing and sue for damages at law." (quoting *Davis*, 2009 WL 3415284, at *8)). Given plaintiff's request for damages here, the Court will treat plaintiff as choosing the remedy on the breach of contract claims.

15

*Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007).

As relevant here, the Tennessee Supreme Court has held that "there can be no actionable claim of conspiracy where the conspiratorial conduct alleged is essentially a single act by a single corporation acting through its officers, directors, employees, and other agents, *each acting within the scope of his or her employment*." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 703–04 (Tenn. 2002) (emphasis in original). If representatives are acting within their representative, agency, or employment capacities on behalf of a corporation, their actions are attributed to the corporation. *Id.* at 704 (citation omitted). Thus, "[a]s long as the agent is acting within the scope of his or her authority, the agent and corporation are not separate entities and cannot be the sole parties to a conspiracy." *Id.* Accordingly, to be able to succeed on a claim of "intracorporate conspiracy," a plaintiff must allege in its complaint that "corporate officials, employees, or other agents acted outside the scope of their employment and engaged in conspiratorial conduct to further their own personal purposes and not those of the corporation." *Id.*

In its complaint, plaintiff states that, "[u]pon information and belief, each [d]efendant was the agent . . . and/or employee of each and every one of the other [d]efendants and was acting within the course and scope of his authority, and each [d]efendant ratified, authorized, and approved of the acts of each other [d]efendant" [Doc. 1 ¶ 7]. Given this allegation, the Court reasonably concludes that the individual defendants in this case, Mohran, Shriak, and Vibhu, were employees or agents of defendant HHM, a

16

corporation [*See id.* ¶ 2 (describing defendant HHM as a California corporation)]. Therefore, for plaintiff here to succeed on its civil conspiracy claim against all defendants, plaintiff must allege that defendants Mohran, Shriak, and Vibhu "were acting outside the scope of their employment [and] that they were pursuing their own personal objectives." *Trau-Med of Am., Inc.*, 71 S.W.3d at 704. Upon a thorough review of the complaint, plaintiff has not made these required allegations. In turn, the Court finds that plaintiff has not sufficiently pleaded a claim for civil conspiracy.

### C. Damages, Attorneys' Fees, and Costs

Although the Court must take as true the factual allegations regarding liability in the complaint, plaintiff must prove the appropriate amount of damages. *Bogard*, 2013 WL 2209154, at *3. In determining damages, "[t]he Court may rely on affidavits [and other materials] . . . without the need for a hearing." *Dirs. of the Ohio Conf. of Plasterers & Cement Masons Combined Funds, Inc. v. Akron Insulation & Supply, Inc.*, No. 5:16-CV-1674, 2018 WL 2129613, at *5 (N.D. Ohio May 8, 2018).

Here, plaintiff seeks damages from all defendants in the amount of $5,825,739.64, attorney's fees in the amount of $23,722.06, and post-judgment interest [Doc. 34, p. 3; Doc. 34-1, p. 2; Doc. 35, p. 3; Doc. 35-1, p. 2; Doc. 36, p. 3; Doc. 36-1, p. 2; Doc. 37, p. 3; Doc. 37-1, p. 2; Doc. 38].

#### 1. Damages

As stated above, plaintiff seeks $5,825,739.64 in damages based on plaintiff's purchase of the Subject Accounts which have not been paid [Doc. 1 ¶ 29]. In support of

17

this damages request, plaintiff attaches to its motions for default judgment the declaration of Bryan Alsobrooks, the President of the Transportation Division at Gulf Coast Bank & Trust Company [Docs. 34-1, 35-1, 36-1, 37-1]. Alsobrooks states that, "[p]ursuant to the Complaint and a review of [p]laintiff's accounts, the balance due and owing" by defendants includes $5,825,739.64 from defendants "original obligation" [Doc. 34-1, p. 2; Doc. 35-1, p. 2; Doc. 36-1, p. 2; Doc. 37-1, p. 2].

"The purpose of assessing damages in breach of contract cases is to place the plaintiff as nearly as possible in the same position [it] would have been in had the contract been performed." *BVT Lebanon Shopping Ctr., Ltd. v. Wal-Mart Stores, Inc.*, 48 S.W.3d 132, 136 (Tenn. 2001) (quoting *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993)).[5] Damages for breach of contract include those directly caused by the breach which "may be reasonably supposed to have entered into the contemplation of the parties." *Id.* (quoting *Simmons v. O'Charley's, Inc.*, 914 S.W.2d 895, 903 (Tenn. Ct. App. 1995)). Plaintiff has sufficiently established that an amount of $5,825,739.64 in damages is owed by defendants based on plaintiff's purchase of the Subject Accounts which have not been paid [*See* Doc. 34-1, p. 2; Doc. 35-1, p. 2; Doc. 36-1, p. 2; Doc. 37-1, p. 2]. Accordingly, plaintiff has shown that damages in the amount of $5,825,739.64 are proper.

### 2. Attorneys' Fees

Plaintiff requests $23,722.06 in attorneys' fees [Doc. 34, p. 3; Doc. 34-1, p. 2; Doc.

---

[5] The Court finds it most appropriate to address damages under plaintiff's breach of contract claims. In the alternative, however, the Court also finds that plaintiff is entitled to recover the same damages under a theory of unjust enrichment.

18

35, p. 3; Doc. 35-1, p. 2; Doc. 36, p. 3; Doc. 36-1, p. 2; Doc. 37, p. 3; Doc. 37-1, p. 2; Doc. 38].  Plaintiff substantiates its request with an affidavit from one of its attorneys, Courtney Creal, as well as invoices related to this case [*See* Doc. 38-1].  In its motions for default judgment, plaintiff submits that, pursuant to Section 24 of the Factoring Agreement, defendants collectively and individually are responsible for attorney's fees [Docs. 34, p. 3; Doc. 35, p. 3; Doc. 36, p. 3; Doc. 37, p. 3; *see* Doc. 1-1, p. 17].

Despite plaintiff's characterization of the $23,722.06 amount as "attorneys' fees," it appears, from a review of the invoices provided, that plaintiff is instead requesting $17,336.65 in attorneys' fees and the remaining $6,385.41 in costs [*See* Doc. 38-1, pp. 7-45].  The Court turns first to the $17,336.65 requested in attorneys' fees.

In determining whether the requested amount of attorney's fees is reasonable, courts often employ the "lodestar method" which is "the proven number of hours reasonably expended on the case by an attorney, multiplied by a reasonable hourly rate."  *Isabel v. City of Memphis*, 404 F.3d 404, 415 (6th Cir. 2005).  Twelve factors are considered in determining the reasonableness of hours and the rate:

> (1) time and labor required; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time and limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in "similar cases."

19

*Id.* at 415–416 (quoting *Reed v. Rhodes*, 179 F.3d 453, 471–72 n.3 (6th Cir. 1999)). However, "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Id.* at 416 (internal quotation marks omitted) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).

In determining the appropriate hourly rate to apply, courts "must consider the prevailing market rate in the relevant community for the same type of work at issue." *Brooks v. Invista*, No. 1:05-CV-328, 2008 WL 304893, at *3 (E.D. Tenn. Jan. 30, 2008) (citations omitted). For fee purposes, the "relevant community" is the "legal community within the court's territorial jurisdiction or venue." *Id.* (citations omitted). The "prevailing market rate" is "that rate which lawyers of comparable skill and experience can reasonably expect to command within the relevant community." *Id.* (citations omitted).

Upon review of Attorney Creal's affidavit and the attached invoices, the Court cannot determine whether the requested attorney's fees are reasonable. Foremost, the Court's own calculation of attorneys' fees from the invoices provided, done by adding together the "Total Services" amounts for each invoice, results in a total of $24,907.25, which exceeds plaintiff's present request by thousands of dollars.[6] Second, one of the invoices submitted by Attorney Creal, which has a period end date of May 31, 2025, contains heavy redaction such that the timekeeper, i.e., the attorney or paralegal whose

---

[6] This total includes the $1,258 categorized as "Unbilled Time" at the end of the provided invoices [Doc. 38-1, p. 45]. Additionally, for invoice 1407509, the Court had to use the "Total Legal Fees" minus the "Less Courtesy Discount" to determine the "Total Services" amount given that invoice's redactions [Doc. 38-1, p. 30].

work is being recorded, the hours worked, and the amount to be charged cannot be determined for 14 lines [Doc. 38-1, p. 32]. Yet, Attorney Creal provides no explanation for this redaction.

Even if the Court were to presume that these lines were not to be counted as going towards the attorneys' fees, the calculations would not equate to what plaintiff requests.[7] Given the uncertainty of plaintiff's requested amount of attorneys' fees, the Court cannot adequately determine whether such request is reasonable. *See Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) ("The key requirement for an award of attorney fees is '[t]hat the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation.'" (quoting *United Slate, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n.2 (6th Cir. 1984))). Accordingly, plaintiff's request for attorneys' fees is denied without prejudice.

### 3. Costs

Finally, and as stated previously, plaintiff requests $6,385.41 in costs [*See* Doc. 38-1, p. 45 (labeled as year-to-date "disbursements")]. From the attached invoices, the Court can ascertain that plaintiff incurred $3,300 in asset searches fees [*id.* at 9], $405 in

---

[7] Specifically, if the Court were to include the remaining, unredacted lines of work in its calculation, with no "Less Courtesy Discount," the resulting figure would be $18,433.65 [*See* Doc. 38-1, pp. 20–21]. And if the Court were to consider the "Less Courtesy Discount," the figure would be $17,597.25 [*Id.*].

filing fees [*id.* at 15], $3.80 in PACER expenses [*id.* at 20, 28], $200 in a people search/comprehensive report from TransUnion, likely to track down defendants [*id.* at 20], $14.76 in copying fees [*id.* at 28, 33], and $2,243.35 in service of process fees [*Id.* at 21, 33]. The Court finds that these particular costs are reasonable and substantiated.

However, the remainder of the costs asserted by plaintiff cannot be ascertained by the Court. Specifically, plaintiff requests costs of $5 for 'Writ Texas Partners (Gulf Coast-DCIM)" [*Id.* at 20–21] and $213.50 for "First Legal Network Insurance Services" [*id.* at 21],[8] but neither of these labels provide the Court with enough information to reasonably ascertain the purpose of these costs. Accordingly, based on these findings, the Court will only award plaintiff $6,166.91 in costs. The remainder of plaintiff's request for costs, i.e, $218.50, is denied without prejudice.

## III.    Conclusion

For the foregoing reasons, plaintiff's motions [Docs. 34, 35, 36, 37] are **GRANTED in part** and **DENIED in part.** The Court will **ORDER** that plaintiff recover from defendants the total sum of $5,831,906.55 and post-judgment interest according to law from the date of the forthcoming judgment order until the amount is paid in full as detailed:

| Damages | Costs | TOTAL |
|---|---|---|
| $5,825,739.64 | $6,166.91 | **$5,831,906.55** |

---

[8] The Court notes that plaintiff also lists "First Legal Network Insurance Services" for the service of process of defendants Mohran, Shriak, and Vibhu [*See* Doc. 38-1, p. 21]. However, plaintiff's final listing of "First Legal Network Insurance Services" does not indicate for what the service was utilized [*Id.*]. Thus, the Court separates it from plaintiff's other three, more detailed listings.

22

Plaintiff may renew its request for the costs denied, as described above, and attorneys' fees with appropriation documentation within **30 days of the entry of this Memorandum Opinion and Order**. If no timely motion is filed, the Court will enter judgment, and this case will be closed.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

23